Baxter v. Hendren is next. Good morning. Mr. Maurice, is that how I pronounce your name? I'm Maurice, Your Honor. Thank you. Good morning. Good morning. May it please the Court, my name is John Maurice. I represent the appellants, families of A.J. Crooms and Sincere Pierce decedents here. This case presents a familiar category of use of force in this circuit and others, whether or not the Fourth Amendment justifies the use of lethal force on a moving vehicle because of the threat of a moving vehicle. I watched the video and I was far less certain about this case in reading the briefs, but after I watched the video, it sure looked like your client was driving that vehicle up over the curb, onto what appears to be residential property, going in the direction of the officer in a way that an officer could reasonably perceive the vehicle posed a threat to him as a weapon. What am I missing? A couple of things, Your Honor. The video is, and there's a couple of videos that have been presented to Your Honor, raw video and then the enhanced version that was provided by law enforcement. Video shows, and it's important, there's no question, it shows the event from a fixed perspective and it only shows half of the shots of the 10 shots fired by the officer. What is crucial in being on scene, and we get this from Deputy Hendron, who was standing just to the Deputy Santiago's right, we get this from two eyewitnesses who witnessed the entirety of the event, is the direction of the vehicle, the way it's turned before it moves, and the obvious and large gap in the yard on Stetson Street south there back onto Ivy Drive. There were three eyewitnesses. Counsel, haven't we said in the Davis case, for example, quote, we also question how useful a barometer for reasonableness in this case is the conduct of the other officers on scene. More than one course of action can be reasonable. The other officers decision not to shoot does not render Waller's choice in that case it was Waller was the officer, the choice unreasonable. This is especially so considering the dissimilar positions of the officers on the scene that would seem to apply to the eyewitnesses here also in other words, you have one witness who's behind you have one who's in the car. Their perspective is very different from the perspective of the officer here and even the other officer who's further away from where the car is coming right at him, and I watched the video and reach the same conclusion the chief judge did that those perspectives would seem to be very different and not necessarily. For summary judgment purposes relevant right. I think they're relevant, your honor I can see that they're different. No one is in deputy Santiago shoes in that moment. And to state the obvious, the dash camera video that shows the event is not in deputy Santiago shoes either. So I agree with you that those are different perspectives, and that must be taken into account, but I don't it does not make them irrelevant, because, particularly in deputy Hendron's case, this is a trained deputy with gun trained. Let me let me put it in summary judgment purposes not irrelevant, but not material enough to create an issue of material fact regarding whether this officers perception was reasonable I mean that that's the question for us. And it seems to me that we've said till this I think which the chief judge wrote it seems to be directly on point here, where a car is not just coming at someone but even in the vicinity of somebody. We've said is sufficient because we don't know the officer doesn't know if someone's going to turn the car in their direction, even if it's going in a bit of a different direction at the time. And here there's no dispute as I understand it that the car was at least within six feet of the officer is any of what I just said wrong. A couple of things. The car being in the vicinity of an officer in and of itself does not justify lethal force and I'm not not being cute about that but obviously if the car is close and facing the opposite direction and driving and I understand. Of course, but but here's what we said in until us, we quote, we never stated that the officer was required to be in the direct path of the moving vehicle to have a reasonable fear for his safety. That's correct. Judge, can I can I go to the facts here that you must admit the officer was in the direct path of this vehicle. The video shows that.  We do not admit that your honor and we have an expert witness who shows that the officer was not in the path of the moving vehicle and that is particularly because of the direction, which the car was pointed in the direction, which the car traveled. Okay, let me let me back up then one. Okay. You agree with me after he backed around the driveway and turned around. He then went over the curve is the chief said, and his car was fully up into the other. He was off the road fully up into the neighbors or the that house. Correct. That's correct. In that yard. Yes, your honor. Okay. And you will also can see that the officer was in that yard standing right there in that yard. How many the officer was in the yard. He wasn't in the street. He was standing on the grass. You can see that in the video. I believe that the officer. He is just to the front and left of his vehicle. If you're from his perspective. Right. Right. But he's in the yard. He's not in the street. He may he his vehicle may be nearby, but he's in the yard. He's let's say it another way. He's not in the street. I don't, I believe he's near the curb. When the event begins, he moves during the event. So he certainly ends up in the yard, I believe, as he moves with the vehicle. Okay, well, he's, he's in the yard at the time the vehicle accelerates over the curb. So, your honor. Okay, I don't think. All right, let's let's go back this. Okay. So, he's not in the street. At any time you see him on the video. He's not in the street. Right. I believe he is on the street near the curb to begin, because his vehicle is parked in the street. Back a bit from deputy Hendren's vehicle. His vehicle is is jutting into IV drive. So off. Let's let's see if you'll even can see this, that the two vehicles are blocking the street, which is why the car goes up. Let's try it with this way. The two vehicles are totally blocking the street. So your client can't come. I mean, the client that let's say the, the moving vehicle can't go down the street. Will you agree with that. Yes. Okay. And so the vehicle does, because it can't go down the street, it could have turned right and gone away. Fine. Absolutely. Is that correct. Correct. If you're speaking of through the front yard of the home at 1301 Stetson. Yes. Correct. No, I'm talking about, it could have, it could have turned in the opposite direction. It could have gone in the opposite direction. Yes. And left the scene. Right. And it couldn't go, it could have gone right, but it couldn't go left. Okay, so what the vehicle does, because this is what the officer seeing the, the officer seeing that the right turn is totally unobstructed. I mean, the right, he could have turned right, and it's totally unobstructed. Correct. You're saying, as he backs out of the driveway. Yes, yes. Okay, so the vehicle goes up on the, on the curb into the yard of the neighbor. And how far in the video. Do you. I know what I think, but I'm going to know what you think how far when we look at the video is that car from the office or just like six, six feet. Do you agree with the six feet. I believe the record demonstrates, whether it's to the exact inch or not is 10 feet to begin. And then as it moves, and the officer moves it closes to as close as six feet and then continues to break away. This is so the shots don't occur until six feet. The shots occur 1.3 seconds after the initial. I'm trying to get how many feet. I'm not sure. I don't think I don't think that I don't know the answer to that question. I don't think the car is at six feet yet at the first stop. Because it closes from 10 to 6, but it's somewhere in between there. The car has to move that somewhat before it closes that gap and then continues to move on. Okay, and and I'm curious about your statement that there were 10 shots fired. I think that's not disputed. Is that correct? Yes. Yeah, happily. Okay, and you say only six were fired before the vehicle got past the officer. Yes, the, the, the, the important point is that shot seven, eight or nine. We don't as they've been labeled. We don't know what order in which they were fired, but they killed the driver. Okay, where are the shots in our 789 enter the vehicle? They enter it right near the driver's side window. In that in the driver's side window, the, the, the 6 enters the pillar, essentially, if you're the driver, the pillar to your front left. And then 789 enter the driver's side window and 10 enters the pillar between the front and back window on the driver's and all 10 shots occurred within how many seconds was it 3 seconds or 10 seconds less than 3. It was 2.1 and 2, I believe. Less than all 10 shots occur within 3 seconds. Yes, Judge. Okay, thank you. That answers my question. And the vehicle was moving when shot 789 occur. Yes, Judge. Okay. I will yield the rest of my time for rebuttal after Mr Poland has had a chance. Thank you, Your Honor. Okay. We'll give you four minutes then you had saved three will give you for Mr Poland. Good morning, Your Honor's may please the court. My name is Tom Paulton I'm here on behalf of Sheriff Ivy, and the estate of Deputy Santiago Miranda, I will refer to him as Deputy Santiago. I want to just pick up on some of the factual questions that were being asked. Council is correct that the distance between Deputy Santiago and the vehicle. When it first lurched forward was 10 feet, it reduced to just under six feet. And the deputy, you know, literally had a split second to decide what to do. The all 10 shots were fired in two to our experts at two seconds, their expert. I'm sorry. So 2.1, their experts said two seconds. The vehicle is moving throughout. The plaintiffs have have often claimed that the vehicle was moving slowly. It was only going 12 miles an hour when it reached the deputy. But the accelerators matched 100 percent, and it hit the house behind the deputy to the left of the deputy. The I think it's very important that the court remind remember as well that as Deputy Dominguez or I'm sorry, Deputy Santiago is walking towards the vehicle. He gave eight verbal warnings, at least eight that we can hear picked up by the dash cam to stop the vehicle. He's got gun drawn. But the windows are up in the vehicle, right? All the windows up in the vehicle. Yes. Now, what did the incident? I don't know that that's all that important, because the question is from the deputy's perspective, whether he believes he's given a warning. It's whether they actually it's very clear from the video that he's shouting. Yes. And in fact, the surviving passenger in the car said that he heard it. Whether Mr. Crooms did or not, we don't know that. I need to know the surviving passenger was deposed and said he heard shouts. Yes. Kimbrough Kimbrough Rucker. But again, it's it's whether they heard it. I want to ask a predicate question while I can before we're getting to this. So at the summary judgment stage, they're originally, as I understood it, that some of the counts had two embedded claims within the counts. One of them was the excessive force claim we've been talking about. And the other one was a failure to render medical aid account claim within embedded with each count. And that was one as to Deputy Santiago and one as to Deputy Hendren. When it got to the summary judgment papers, the response to the summary judgment from the plaintiff was, hey, we're dropping all our claims as to Hendren and we're dropping a failure to render medical aid claim regarding Deputy Santiago. Here's what specifically it wrote at page 50 of docket entry. Ninety six plaintiffs have decided not to pursue their claim based on failure to render medical aid. And then in the heading, it says plaintiffs dismissed their claims for failure to render medical aid against Deputy Santiago. Remaining in that same claim was the excessive force claim against Deputy Santiago. The district court handled it this way when faced with with that statement in the in the response in the summary judgment brief. The district court said, quote, sorry, this is at pages three and four of the order. In plaintiff's response, plaintiffs state that they are no longer pursuing their claims for failure to render medical aid as to either deputy, nor are they pursuing any claims against a deputy Hendren. The court construes this announcement as a motion for voluntary dismissal pursuant to federal civil procedure. Forty one to two, which will be granted. We've said many times now in the last year or two that the fifth dismissal of a claim cannot be done and is ineffective as to rule. Forty one to two. What do we do with the fact that the district court ineffectively dismissed a single claim? Does that mean the claim is still pending and such that it defeats our final judgment jurisdiction under twelve ninety one? What do we do with that? Well, your honor, several things. First of all, I think it's less important the language that the court used in interpreting it as a forty one to dismissal. And rather than if you look back at what the plaintiff actually said, they they were conceding the claims. They weren't just taking a voluntary dismissal. That forty one eight two, though, does make sense insofar as it involves dropping a party. Right. So for for Hendry Hendren, that that that that could be under our precedence. Under the Clay case, this court set and decided that that's concerning. What you're saying then is then as to Santiago, it's a concession by the plaintiff that it cannot the plaintiff cannot defeat summary judgment on that claim. And so when the district court enters summary judgment on that claim, it is adjudicating that claim against Santiago as well. And there's and that hasn't been appealed. Right. And the language from plaintiff's response was plaintiffs have decided not to pursue their claim based on failure to render emergency medical aid. That was the one remaining claim. So the only claim left to be adjudicated or where it was controverted at that point would be the excessive force claim. So. So I've taken a look at a bunch of our case law and it seems and tell me if I'm wrong. I know you guys just a brief some of this. I know you're familiar with it. It seems that where there's an ambiguity about what happened below, we have taken it upon ourselves to construe things a certain way in order to not defeat our jurisdiction. But it also seems that where the district court has taken pains to tell us how it is construing something, we take the district court at its word. That's what we did in Roselle, where we had a similar a similar sequence where one party said, hey, we're not we're not doing anything with this anymore. We're done with this. And the district court said, I'm construing that as a rule. 41 go file a notice. They filed a notice and I recognize the notice and this claim is dismissed. Why wouldn't we take the district court at its word where it tells us exactly how it's construing something, whether it should or should have done it that way? Well, I think that your question, though, points to the answer, which is that nobody thought that that was necessary. Right. Nobody felt that it was necessary to file a stipulation of dismissal under 41. I understand that you guys haven't taken our instruction to get rid of claims through Rule 15. So I don't I don't begrudge the district court for trying to make a chicken salad out of chicken. You know what? So I guess what I'm saying is where the district court made a particular kind of chicken salad, you know, put the pecans and the grapes in the good kind. Why we would then say, no, we're going to make a different kind and call it something else. Well, I think that at the end, if you look at the order, the court is acknowledging that the plaintiffs are no longer pursuing those particular claims as to Hendren at all. And as to Santiago, in terms of the failure to render it medically, the fact that the court says, I'm interpreting this as you announcing a dismissal. Let me make sure I understand something. The decreed language in the order dismisses the claims against Hendren with prejudice. Right. Right. And they grant summary judgment for the defendants on all remaining claims. Right. Correct. Which means it can be construed. It's not so clear. It can be construed that what it's doing is it's entering forty one, a two as to Hendren and summary judgment as to Santiago. And that's permissible under Clay to do it that way. Your Honors, I don't see a clock on my end. You've got seven minutes. Seven minutes. OK. Thank you. All right. So returning to the to the to the substantive argument on the merits, I want to also ask that the court please look at the trajectory of the fire of the bullets that struck the vehicle on this question of whether the deputy deputy Santiago is actually in the path of the vehicle. As plaintiff argues, that's not the actual question, whether he was actually going to get hit. It's whether he could reasonably perceive in his position that he was going to get hit. And under Tillis, the court noted that if you're in proximity to the vehicle, even if you're not in the direct path and you could reasonably believe that you would be struck, then you are authorized to use deadly force. The court said the same thing in Singletary versus Vargas citing Robinson. Even if in hindsight, the facts show that the defendant perhaps could have escaped unharmed. We conclude that a reasonable officer could have perceived that the suspect was using the car as a deadly weapon. In this case, he's given eight warnings. The vehicle is 10 feet away. It accelerates forward. And in a span of two seconds, 10 shots are fired. All 10 shots are fired. And in fact, I want to make the point, Your Honor, that this isn't where there's like a separate volley of shots as there were in Tillis, you know, where the issue was the second set of shots. This is one set of continuous shots, 10 and two seconds. And the deputy said in his statement at the time, his sworn statement, that the reason he stopped firing was that he perceived now that the vehicle was no longer a threat when it reached when it came up next to him. But he had already fired those 10 shots, including the three that went in through the front pass or front driver's side window and presumably struck Mr. Can you tell me where the 10 shots went in so I can just know that I think I know. But he said the most important thing is the two shots in the photographs that you'll see from the FDA, the Florida Department of Law Enforcement. I think we actually put them in the briefing. If not, they're in the summary judgment motion. We actually put them A and E are the first two shots. The first one is into the directly in the center of the windshield or almost directly in the center of the windshield. The second shot is into the hood of the vehicle. Shots three, four and five are moving. As you look at the vehicle left to right. And that's because the vehicle is now moving at him and coming across his field of vision. The sixth shot is into the pillar between the front windshield and the driver's side door. Seven, eight and nine are into the driver's front door. And shot 10 is into the pillar between the front door and the back door on the driver's side. When you say three, four and five moving left to right, are they going in the front windshield? Yes. And the hood. Thank you. You're welcome. And the. You still got four minutes. OK, well, you know, your honors, I mean, I think the video and whatnot is pretty clear. I do want to remark about the perspective of other people. Deputy Hendren said that her perspective was different than Deputy Santiago. She's not in the path of the vehicle. She's over by her vehicle on the other side of Stetson. And, you know, she can't testify to what Deputy Santiago would reasonably perceive. And we have the video of that. The evidence in terms of the distances, the timing of the shots, none of that is controverted. And so when a when plaintiff's expert says, well, he wasn't actually in the path of the vehicle, that doesn't defeat summary judgment because that is not the right legal issue. The right legal issue is whether he could reasonably perceive that he was in the path of the vehicle. Let's talk about what the video shows as to that point. So tell me when the video starts, where is the deputy standing in the street? Is he on the curb? You can't see that. He has to get out of his vehicle as the facade is backing out of the driveway. Well, we know he's out of his vehicle. It starts with him off his vehicle. Right. You were asking me at the time the video starts. So I'm thinking in terms of the full dash cam video, you may be talking about the FDA enhanced video, which focuses on. That is the one I'm talking about. F.A.E.L.A. enhanced video. Yeah. He states that he in his sworn statement, he testified he was walking up on the curb. And I mean, the distinction to me isn't that meaningful because we see the vehicle and the way that it moves relative to him and it's moving towards him, whether it gets within six inches of him or three feet of him or four feet of him isn't really meaningful here. I think for summary judgment purposes, because, again, Deputy Santiago could perceive that it was going to strike him or at least he was at grave risk of that. We can't, you know, base this on 2020 hindsight and figuring out that what we understand, those general principles. I'm just trying to understand how you articulate what you contend the video shows. OK, when the vehicle starts to move towards him, where is he and where is the vehicle? When does that point begin? He is 10 feet away from the vehicle when it begins to move and he is, for lack of a better phrase, center mass. And we know that because those first two shots went directly into the center of the. OK, and so and so where when that occurs, where is the vehicle? Is it on the neighbor's yard? Is it in the street or is it where it's a vehicle when the shots? I'm sorry, your honor. I don't mean to interrupt you. It's it's it's still on the pavement on the pavement. Right. And then what it did is when it backed out of the driveway, it initially was pointed towards more towards Deputy Hendron. But then it backs up and reorients more towards Santiago that the plaintiff's argument is that the wheels ultimately turn to the right. And that indicates Croom's going is going to try to drive around the deputy. But I don't think it's fair to have the deputy have to make that assumption. The court said in Tillis that a deputy in that situation is not expected to evaluate angles and trajectories in a split second. Let's just go back. The shots are center mass. They go in the the center of the windshield of the hood, you said. So the car is on the pavement and it accelerates. And where is the deputy in the start of the video? The video he I believe his testimony, he's on the curb. You can't see his feet in that video, whether he's in the in the yard or in the on the pavement. But I believe that you think his testimony is that he was on the curb. Yes, I believe that that's correct. But OK, well, again, I'm not sure that that's meaningful. Well, you know, we will have to describe what the video shows in any opinion, Mr. Bolton. OK, so can you appreciate that? We need your assistance sometimes with the record that you should better understand than us. We're hearing a bunch of appeals this week that we could. We just we just need your assistance in describing what happened here. Yeah, we know the principles, everybody. We're just trying to how you write what the video does. It does not show if you can both agree to it or know where you disagree. So because I had it wrong, I had him on the grass. You've just said he's on the curb, which is what Mr. Maurice said. OK, so I mean, I just I don't care what it is. I just want to know what it is. Yeah. Yeah. And you're here to help us. OK, I appreciate that. And I'm not so just walk me through it very quick as to what the enhanced video shows. OK. And along with his testimony that you think together, just because it won't take it only happened ten seconds. So, I mean, just tell me what it shows and then we'll ask the other side to do the same. You can't see his feet in the video, so you can't firmly establish whether he's on the curb, slightly on the pavement or slightly in the yard. Not from what you have in the video. But what you have is his statement at the time, the sworn statement of the time that he was walking on the curb. And then the vehicle moves forward at him. And he that's what causes him to fire. You're telling us there's no there's no evidence to the contrary as to what that testimony is, his statement about his placement. Yes. OK. OK. And so the vehicle moves forward him and the vehicle starts. It is on the pavement when it moves forward him. You will agree with his statement about that, right? Yes. Yes. OK. And has it not gone in the neighbor's yard yet? But it does move. But it's on the pavement is part of it on the neighbor's driveway or is it fully on the pavement or can you tell? You can tell. And my recollection is that it's. Angled towards the driveway. But towards the deputy, the deputy is in line with that and then it runs up. Over the driveway curb and into the yard. OK, that's helpful. Thank you. Yeah. OK. And I didn't mean to be dismissive of the placement of his feet. What I'm saying is that whether he's in the yard or on the pavement, I think is less important than where he is relative to the vehicle. Yeah, I understand. You were trying to to make a legal argument. We were just trying to figure out what the record shows. Thank you, Mr. Poulton. Thank you, Your Honors. Mr. Marisa, you've got four minutes. Thank you, Your Honor. The numbers in a vacuum, 10 feet, six feet, two seconds. They're important and they're a starting place. And what is an important part of plaintiff's case is the testimony of Jeremy Bauer, who did a forensic analysis of the officer's reaction and compared it to law enforcement. Officer reaction times to threat stimulating. These are published studies that tell us how quickly an officer in a range. There are fast times. There are slow times. How quickly an officer typically responds to this kind of a thing. And. So, yes, two seconds is fast. Ten feet is is is not close. It's close. So what? If you look at Mr. Bauer's testimony, what he tells you is that the shot doesn't come until one point three seconds after the deputy moves in anticipation of the vehicle. That is slower than the slowest reaction time. From a law enforcement officer in a study to threat stimuli. And what that means is the gunshot is not in react from plaintiffs on plaintiffs. It's not in reaction to the vehicle. And the standard is that's a subjective determination, not an objective determination. And I just don't think that kind of expert testimony goes to the inquiry we're concerned about. I agree with you that it relates only to deputy Santiago's action in the event. And that and that his subjective action, even if it demonstrates the fact that he was not responding to the threat, it is an objective, reasonable inquiry. And you might conclude, nonetheless, that it is it was an objectively reasonable response, but it is powerful evidence in conjunction with. And it is some evidence tending towards plaintiff's argument in conjunction with deputy Hendron's observations and testimony. Can I can I ask you quickly about the jurisdictional issue before your time runs out? I want to go back to page three and four of the district court's order. And what the district court there said in two sentences is one first sentence. Plaintiffs state that they are no longer pursuing their claims for failure to render medical aid as to either of the deputies. Or are they pursuing any of their claims against Hendrick? And then cites to page fifty three of your response, which I read earlier. And the next sentence is the court construes this announcement as a motion for voluntary dismissal pursuant to rule forty one to two, which will be granted. Is this announcement everything that preceded that sentence? In other words, the that you're no longer pursuing the claims for medical aid against Deputy Santiago, Deputy Hendron and all the other claims against Deputy Hendron. We were conceding summary judgment on those claims. Well, I know you say that now, but I'm asking how the district court read it. So because that's really what we're reviewing is the district court's order here. Well, but it's interesting what I can ask my question if I can ask my question. Thank you. So when it says the court construes this announcement. Is this announcement that which the sentence preceding it or is it something else? I'd be speaking for the district court. Your best reading. You read orders are in this business. What do you think the district court meant? I think he's referencing the position that plaintiff took in no longer pursuing the claim. So I think the announcement is with it in reference to plaintiff's decision to not pursue the claims. I mean, as context, you file claims, you conduct discovery. Some of them are not borne out by the evidence. So with the rule. So if the rule 41 motion that's granted that he construes, that would include deputy, the failure to render a claim against Deputy Santiago. I'm not sure, Your Honor. Did you file a rule 41 motion? I don't. Did you ever file a rule 41 motion, a separate motion? I did not. Mr. Murray, when you get to the cradle language of that, the decree to language, what the district court does, if I remember this right, is it dismisses the claims against dismisses the claims against Hendren with prejudice. Right. Yes, Your Honor. It doesn't do that with Santiago. Right. It enters judgment against Santiago. That's right. You can't speak to the district court. You can speak for yourself. And as I understood what you said, what you were trying to do in your summary judgment response was concede summary judgment as to Hendren. Is that correct? Yes, Your Honor. Which is what the district court did. Okay. And you are trying to concede summary judgment as to the medical claim as to Officer Santiago. Is that correct? Yes, Your Honor. Okay. Now, what the district court then wrote, I mean, is what the district wrote and we have to consider it. But what you are attempting to do in your summary judgment response was to concede summary judgment. And you didn't file any separate motion dismiss on any of this. Is that correct? That is all correct, Your Honor. Okay. Thank you. All right, Ms. Marucci, I think we you've been answering our questions. We appreciate it very much. Is there anything else you want to say since I took a lot of your time? I'm sorry. No, I appreciate everyone's time today. Thank you very much. And thank you for the questions. Well, thank you for, again, like all others, so quickly adjusting our plans and presenting this oral argument this morning remotely. And I want to say you were extremely well prepared and we appreciate that to both sides who are here. Yeah. Thank you so much.